J-A13040-19

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF HELEN C. CITINO | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: ROBERT R. LETO AND | : | |
| NANCY BARONE KRIBBS | : | No. 3356 EDA 2018 |

Appeal from the Decree Entered October 29, 2018
in the Court of Common Pleas of Chester County
Orphans' Court at No(s): 15 17 0247

BEFORE:    SHOGAN, J., NICHOLS, J. and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.:    **FILED AUGUST 27, 2019**

Robert R. Leto and Nancy Barone Kribbs (collectively, Appellants) appeal from the decree entered on October 29, 2018, which denied their appeal from the order by the Register of Wills declining to probate a writing dated September 7, 2010 (2010 Writing) made by Helen C. Citino (Decedent), based upon its lack of testamentary intent.  We affirm.

Decedent passed away on January 29, 2017, at the age of 98.  She was a lifelong resident of Kennett Square, Pennsylvania, and for most of her life, she resided in her home on Rosedale Road.  She never married and did not have children, although she referred to Marguerite Mastrippolito, who lived across the street, as her godchild.  Decedent also had other significant people in her life, such as Leto, who was a long-time neighbor and family friend, and Kribbs, whose mother was Decedent's first cousin, making Kribbs Decedent's first cousin once removed.

_____

*Retired Senior Judge assigned to the Superior Court.

At her death, Decedent had assets worth approximately 2.1 million dollars, including her property on Rosedale Road. Her attorney, Peter Temple, Esquire, first prepared a will on Decedent's behalf in 1981. On October 15, 1999, Decedent executed a new will (1999 Will), again with Attorney Temple's assistance. In the 1999 Will, Decedent bequeathed her residuary estate and most of her personal property to Mastrippolito; her guns to Leto; and monetary donations to several charities. She named Attorney Temple and Mastrippolito as co-executors. Kribbs was not named.

Pertinent to this appeal, the 2010 Writing is a handwritten, signed document written by Decedent[1] on three lined loose-leaf papers. As described in more detail *infra*, Leto contended that he found the 2010 Writing in a bag in Decedent's house after her death. If accepted as an unrevoked holographic will,[2] Leto would receive Decedent's property on Rosedale Road, bonds, and personal property in the house; various named people and charities would receive $2,000 each; Mastrippolito would receive $50,000; and, because the

---

[1] The parties do not dispute that the handwriting is Decedent's handwriting.

[2] Appellants have various theories about the effect of the 2010 Writing, and spend much of their brief discussing them. **See** Appellants' Brief at 37-65. Under all of their theories, the 2010 Writing revoked the 1999 Will, but under some theories, parts or all the 2010 Writing may itself have been revoked by later writings. The inheritance rights of Leto and Kribbs vary depending on the theory. Based on our disposition today, we need not address the alternative theories.

2010 Writing did not provide for her residuary estate, relatives such as Kribbs may inherit intestate. The 2010 Writing did not name executors.

Shortly after Decedent's death, upon petition of Attorney Temple and Mastrippolito, the Chester County Register of Wills admitted the 1999 Will to probate and granted letters testamentary to Attorney Temple and Mastrippolito. Appellants filed a petition for citation to show cause as to why the 2010 Writing, which Leto averred he found in Decedent's house after her death, ought not to be admitted to probate. In the petition, Leto and Kribbs also sought to be appointed as personal representatives of the estate. Following a hearing, the Register of Wills ruled that the 2010 Writing was invalid as a testamentary instrument. Appellants filed a petition sur appeal from the order of the Register of Wills, and later filed a revised petition. Mastrippolito filed an answer, and the parties filed cross-motions for summary judgment. The orphans' court denied the motions for summary judgment and conducted a hearing on October 10, 2018.

The following facts were introduced at the hearing. When Decedent died in January 2017, she was residing at Jenner's Pond Retirement Community. After Decedent died, Leto, on his own initiative, let himself into Decedent's house on Rosedale Road with a key he had possessed for years. While he was there, Leto retrieved a tote bag, which, according to Leto, contained loose handwritten documents, including the 2010 Writing.

The last time Leto saw the bag was when Decedent was residing at Friends Home, a senior community.[3]  Ruby Trivett, Decedent's caregiver, brought Decedent to Decedent's residence on Rosedale Road and met Leto at the house.  Decedent inquired where her bag was, and located a tote bag in the dining room behind the door.  When Decedent unzipped the bag, Leto saw an envelope in the bag marked "will."  Decedent took the bag with her to Friends Home.  Leto assumed Trivett brought the bag back to the Rosedale Road residence when Decedent left Friends Home.

When Leto found the bag after Decedent's death, he did not find an envelope marked "will."  Instead, he found a number of loose papers with Decedent's handwriting, including the 2010 Writing.  The papers also had other dates, including two marked January 15, 2008, one marked March 24, 2010, and two marked March 2, 2011.  The two papers marked March 2, 2011, both state, "This Will will supercede all others[;] the last one was 10-15-1999."  Exhibit R-5.  Most of the handwritten documents reference various bequests of property, and many contain strikethroughs in handwriting.  None of the papers bears Decedent's signature except the 2010 Writing.

---

[3] Leto did not provide a date for the meeting, but testified at another point that Decedent went to Brandywine Hall, a medical rehabilitation facility, for three weeks in 2013, and then moved to Friends Home, where she stayed from 2013 to 2015.

Based upon the holes in the original papers and the marks on the copy, it appeared that the three pages of the 2010 Writing papers were once stapled. Leto testified the 2010 Writing was unstapled when he found it; Attorney Temple said it was unstapled when Leto showed it to him. The first page was denoted "Pg 1" and dated September 7, 2010. Exhibit R-3. There are three paragraphs on the first page, with a long diagonal line running from the top left to the bottom right of each paragraph. Both the handwriting and diagonal lines were written in blue ink. Although the first page ends with "and on Pg. 2," *id.*, Leto testified that there was no "Pg 2" in the bag. On "Pg 4," the last writing on the page is Decedent's signature and the date "9-7-2010." *Id.*

The content of the 2010 Writing is as follows.

Sept 7 – 2010

Pg 1  To Jennifer Fields of Peter Temple, Esquire[4]

This new will supercede all others – the last one was 10-15-1999

I bequeath all my real estate consisting of 20 ½ acres of land, house and garage and contents of house to Robert Leto, P.O. Box 788, Rosedale Road, Kennett Sq. pa 19348, Phone 610-444-2776 and also my Municipal Bonds including 1 CD, contact Don Sellers of Edward Jones 701 East Baltimore Pike Kennett Sq. Pa 19348 Phone 610-444-5220

---

4 Jennifer Field is Attorney Temple's long-time paralegal. Decedent sometimes identifies her last name as "Field" and sometimes as "Fields."

And on Pg. 2[5]
_____

Pg 3   I bequeath the sum of $2,000.00 to the following persons
                                        $2,000 ea
          Parker Leto
          Gabriel James Leto
          sons of Samantha & Robert Leto Jr. of Kennett Sq. Pa
          Celia Francis Leto, daughter of Ray and Emily Leto of
          6322 Duffy Road, Columbus, Ohio

          Jennifer Field of Peter Temple (Jen, can never forget
          how nice you were)

          Kevin McCarthy – Kennett

          Albert McCarthy – Kennett

          St. Anthony Church –
               Wil. Delaware

          St. Theresa, 1313 Frontage Rd, Darien, Il. 60561-
          5340

          St. Jude of Baltimore, Maryland
               c/o Fr. Bob Colaresi, O. Carm

          And to my God child whom I loved dearly 50,000.00
     Marguerite Mastrippolito
_____

Pg 4   *[6]St. Anthony Church
          Wilmington, Delaware

          St. Theresa, Father Bob Colaresi
          1313 Frontage Rd
          Darien, Il 60561-5340

          St. Jude

---

[5] The only writing on "Pg 1" that does not have diagonal lines crossing through it is the date, "Pg 1," and "And on Pg. 2."

[6] There was a handwritten line drawn between the two handwritten stars.

> Baltimore, Maryland
>
> St. Patrick Church
> 205 Lafayette St.
> Kennett Sq., Pa 19348
> Father Sharrett
>
> *901 N. DuPont St.
> Wilmington, Delaware
>
> s/ Helen C. Cintino 9-7-2010

*Id.* (verbatim; some line spacing altered).

Leto testified that he took the 2010 Writing immediately to Attorney Temple. Attorney Temple made a copy of it for his file, but he did not seek to probate the 2010 Writing, prompting Appellants to do so. Attorney Temple testified Decedent never mentioned the 2010 Writing to him or told him she had written her own will.

In addition to the testimony regarding the 2010 Writing, the following evidence was introduced about the nature of the relationships Appellants and Mastrippolito had with Decedent. From the early 1970s until she retired in 1983, Decedent shared a carpool with Leto, who lived one property away from Decedent on Rosedale Road. According to Leto, his family and Decedent's family were friends, and following the deaths of Decedent's siblings, Leto repaired and maintained Decedent's property at her request. Decedent paid Leto for materials but not labor. In 2010, Leto began helping Decedent handle

her financial investments. At Leto's suggestion, she met with his financial advisor and gave the advisor money to invest.

Kribbs, Decedent's first cousin once-removed and the only party related to Decedent by blood, testified she knew Decedent her whole life and visited her periodically as a child and an adult. At one point, after Kribbs had lost touch with Decedent, Kribbs received a Christmas card from Decedent with a note inside from Leto and his wife, informing her who they were and that Decedent was residing at Friends Home. Kribbs visited Decedent at Friends Home and met Leto for the first time.

As mentioned *supra*, Mastrippolito is Decedent's goddaughter and lived across the street from Decedent. According to Mastrippolito, she had known Decedent since birth. Following the death of Decedent's sister Millie in 1997, until 2013, Mastrippolito visited Decedent approximately five times a week. She took Decedent to the doctor, bank, and hairdresser; grocery shopped for Decedent; mailed her mail; and assisted in paying her bills. During this timeframe, the pair went out to eat almost every Thursday night.

In 1999, shortly after she executed the 1999 Will, Decedent executed a power of attorney (POA) prepared by Attorney Temple naming Mastrippolito and Attorney Temple as co-agents. In 2013, while Decedent was staying at Brandywine Hall, Leto contacted his attorney, Thomas E. Martin, Esquire, and arranged for him to prepare a POA for Decedent naming Leto and his wife as

co-agents. Although he had not spoken to Decedent, Attorney Martin brought the prepared POA to Brandywine Hall, where he met with Decedent and the Letos, as well as Decedent alone. Decedent signed the new POA on November 5, 2013.

Trivett, Decedent's caregiver, learned about the switch in POA from Leto's wife and promptly notified Mastrippolito and Attorney Temple. Attorney Temple reviewed the powers granted to Leto and his wife with Decedent. Fourteen days after switching the POA, Decedent instructed Attorney Temple to prepare documents revoking the November 5, 2013 POA and instituting a new POA naming Attorney Temple and Leto as her co-agents. She executed this POA on November 19, 2013. Attorney Temple and Leto remained co-agents at the time of Decedent's death, although Leto was no longer Decedent's healthcare POA. In March of 2016, Decedent revoked her healthcare POA naming Leto as her health care agent and executed a new healthcare POA naming Trivett, her caregiver, instead.

The parties both point to statements by Decedent that they believe demonstrate her discontent with the opposing party. Appellants claimed Mastrippolito and Decedent had a falling out, perhaps causing her to change her 1999 Will to reduce Mastrippolito's share. According to Leto, Decedent told him in 2013 that she had a disagreement with Mastrippolito and "she is out of my life." N.T., 10/10/2018, at 37. Kribbs claimed that she once asked

Decedent why she was not spending a holiday with Mastrippolito. Decedent responded, "[w]e will not speak of her" and pantomimed her lips zipping closed. *Id.* at 108-09. The orphans' court observed that at the hearing before the orphans' court, Kribbs testified this exchange occurred around Easter 2010 (*i.e.*, before the 2010 Writing in September); at the hearing before the Register of Wills, however, Kribbs testified the exchange occurred while Decedent was living at Friends Home, which was in 2013. Orphans' Court Opinion, 1/3/2019, at 8.

Mastrippolito, on the other hand, denied that she and Decedent ever were on bad terms. According to Mastrippolito, she had to stop visiting Decedent in 2013 because Mastrippolito's sister was diagnosed with Stage IV cancer and Mastrippolito's husband also became ill. While Decedent was at Brandywine Hall in 2013, Mastrippolito learned from Attorney Temple that Decedent had revoked her POA. Mastrippolito testified that when she went to Brandywine Hall and asked Decedent about her decision to change the POA, Decedent threw her hands up in the air and said, "Everybody wants the farm!" N.T., 10/18/2019, at 137. Mastrippolito left after Decedent remained upset.

Trivett, who was Decedent's caregiver and often at Decedent's home, claimed Decedent never spoke ill of Mastrippolito, and once told Trivett she did not want to call Mastrippolito because she did not want to be a bother. Trivett was present when Decedent made the comment about everyone

- 10 -

wanting her farm, and testified that Decedent once told her that Leto wanted her farm. Trivett was also present when Decedent revoked the November 5, 2013 POA prepared by Leto's attorney. Both Trivett and Attorney Temple testified that during Attorney Temple's discussions with Decedent about changing the POA to appoint Attorney Temple and Leto as co-agents, he asked Decedent if she wanted to make any changes to the 1999 Will, and she responded no. According to Attorney Temple, Decedent told him she still wanted to honor the agreement she had with her sister Millie. When she executed the 1999 Will, she told Attorney Temple that she and her sister Millie, who also had no children, had agreed to leave their estates to Mastrippolito.

After hearing the above evidence, on October 29, 2018, the orphans' court determined that the Register of Wills did not err in deciding that the 2010 Writing should not be admitted to probate, and entered an order denying Appellants' appeal.

The instant appeal followed. Appellants and the orphans' court complied with the mandates of Pa.R.A.P. 1925. Appellants raise the following issue for our review: "As a matter of law should the [hearing] court and the Register of Wills have admitted to probate the autographic signed September 7, 2010 writing self-designated as a 'will' by [Decedent]?" Contestents' Brief at 4.

This Court has explained that our standard of review in will contests is narrow.

> In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion.
>
> Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

*In re Estate of Tyler*, 80 A.3d 797, 802 (Pa. Super. 2013) (*en banc*) (citations omitted).

Appellants posit that the September 2010 writing is a valid will because it was signed at the end by Decedent and demonstrated her testamentary intent. Appellants' Brief at 33-37. They view the dispute as a pure issue of law. *Id.* at 15. Appellants emphasize Decedent's choice of the word bequeath and her reference to the document as a will. *Id.* at 36. Appellants discount the significance of the missing page, claiming that a missing page is insufficient to defeat a will. *Id.* at 41. They also discount the three diagonal lines on page one, claiming the lines are ambiguous and do not necessarily indicate her intent to revoke all or some of her 2010 Writing. *Id.* at 46-59.

Despite Appellants' assertion that the issue presents a pure matter of law, the orphans' court examined extrinsic evidence after determining there was ambiguity as to the character of the 2010 Writing and the intent of Decedent. Orphans' Court Opinion, 1/3/2019, at 8. The orphans' court found

it to be significant that the 2010 Writing had ambiguous "strike lines" on page one, was missing "pg. 2," appeared to once have been stapled together, and was found amongst other loose papers in a bag. *Id.* at 6-8, 12-13. By the orphans' court's assessment, "[i]t is not possible to determine the internal sense of the document without seeing the missing page and knowing the meaning of the strike marks." *Id.* at 12.

Turning to extrinsic evidence for assistance, the orphans' court observed that Decedent wrote two handwritten notes in 2011 that referenced her will as the 1999 Will and made no mention of the 2010 Writing. *Id.* at 7-8. The orphans' court also emphasized the fact that Decedent never told Attorney Temple or anyone else that she had written a new will. *Id.* at 12. The orphans' court reviewed the testimony regarding Decedent's relationships with Appellants and Mastrippolito, and found to be credible Attorney Temple's testimony that he "gave Decedent ample opportunity to make changes to her 1999 Will [and] Decedent always declined". *Id.* at 12. Thus, "[t]he ambiguity in the document – strike lines on the first page, a missing second page[,] and a suggestion that at one time the pages were stapled together – and the lack of evidence that Decedent intended the document to serve as a will, [led the orphans' court] to conclude that [the 2010 Writing] is not testamentary." *Id.* at 13.

In considering whether the orphans' court erred as matter of law by determining that the 2010 Writing is nontestamentary, we bear in mind the following.

> No rule regarding wills is more settled than the general rule that the testator's intent, if it is not unlawful, must prevail. Moreover, the testator's intention must be ascertained from the language and scheme of his will; it is not what the Court thinks he might or would have said in the existing circumstances, or even what the Court thinks he meant to say, but is what is the meaning of his words.
>
> Our determination focuses on whether we are faced with a document that is testamentary as a matter of law, nontestamentary as a matter of law, or ambiguous, in which case extrinsic evidence is to be considered to resolve the ambiguity.

*In re Estate of Tyler*, 80 A.3d at 802-03 (citations omitted).

"If the instrument is in writing and signed by the decedent at the end thereof and is an otherwise legal declaration of his intention[,] which he wills to be performed after his death, it must be given effect as a will or codicil, as the case may be." *In re Kauffman's Estate*, 76 A.2d 414, 416 (Pa. 1950). The court must determine whether, as matter of law, the instrument "shows testamentary intent with reasonable certainty." *Id.* The form and language of a writing are simply factors to be considered; an "informal instrument may be a fully effective will if the language suffices to show testamentary intent." *In re Ritchie's Estate*, 389 A.2d 83, 87 (Pa. 1978). "The mere fact that [a] paper [is] in the form of a letter does not affect the result." *In re Kauffman's Estate*, 76 A.2d at 416 (construing a handwritten letter reading "dear bill I

want you to have farm Annie Kauffman" as testamentary in nature after examining extrinsic evidence).

"Testamentary intent, however, is an indispensable element for the finding of a will. The writing must be dispositive in character, and the disposition must be intended to take effect after the testator's death." *In re Ritchie's Estate*, 389 A.2d at 87. Instructions and memoranda for use in drawing a will in another writing in the future do not show the intent to make the current writing a testamentary disposition. *Id.* (concluding that a writing was a list or memorandum contemplating a will to be drawn in the future, not a will with testamentary intent); *In re Fick's Estate*, 211 A.2d 425, 427 (Pa. 1965) (concluding letter was merely a direction to lawyer to draw up a new will).

A will may be valid despite being written on "separate, not physically united, sheets of paper only the last one of which is signed." *In re Van Gilder's Estate*, 220 A.2d 21, 25 (Pa. 1966). "The test is: Are the papers 'connected by their internal sense, by coherence or adaptation of parts'?" *Id.* (quoting *Covington's Estate*, 33 A.2d 235 (Pa. 1943)).

Appellants cite to *In re Sheaffer's Estate*, 87 A. 577 (Pa. 1913), in support of their contention that the missing page did not interfere with the ability to determine the testamentary intent of the 2010 Writing. In that case, Sheaffer executed a will in the presence of two witnesses. When the will was

found after his death, the first page, which contained testamentary dispositions, was missing. Our Supreme Court held that the document was properly admitted to probate because it evidenced testamentary intent, notwithstanding the removal of the first page. *Id.* at 579-80. However, we find this case to be distinguishable, as there was testimony that Sheaffer clearly intended the document to serve as his will, and even provided specific direction as to where the will could be found when he fell ill. *Id.*

Instead, we find *In re Fisher's Estate*, 129 A. 90 (Pa. 1925), to be applicable. In that case, after Fisher's death, Fisher's brother found an unsealed envelope with writings in her safe-deposit box. The sheets were not attached, but most significantly, some of the numbered paragraphs were cut off with a sharp instrument. The remaining paragraphs "had not been put together so as to make clear that a completed instrument had been prepared." *Id.* at 90. The Court noted that Fisher's brother had access to the safe-deposit box, leaving open the possibility of wrongdoing or mistake. *Id.* at 90-91. Therefore, the Court held that because it was unclear what was in the paragraphs that were removed, and something may have been "omitted[,] which the decendent may have intended to include," the orphans' court did not err by refusing to admit the document for probate. *Id.*

In the instant case, similar to *In re Fisher's Estate*, the ambiguous lines on page one, the missing "pg. 2," the likely detachment from its original

staple, and its location in the bag with many other loose handwritten papers, make it unclear if the 2010 Writing is connected by its internal sense. Furthermore, as originally written, the salutation to the paralegal in Attorney Temple's office indicate the document may not have been testamentary in nature, but instead was a letter to Decedent's lawyer or notes to herself regarding changes she pondered making to her 1999 Will. *See In re Ritchie's Estate*, 389 A.2d at 87; *In re Fick's Estate*, 211 A.2d at 427. Therefore, we conclude that the testamentary intent of the 2010 Writing is ambiguous.

The extrinsic evidence further bolsters the conclusion that the 2010 Writing was likely a letter to Decedent's attorney or notes to herself. The 2010 Writing was not the only writing addressed to Attorney Temple's paralegal. Moreover, like the orphans' court, we find it meaningful that Decedent's other notes dated after the 2010 Writing referenced her will as the 1999 Will, Decedent told Attorney Temple in 2013 that she did not want to make changes to her will, and she never told anyone she made a new will. The record indicates that Decedent had an ongoing relationship with Attorney Temple and regularly used him, and others, to attend to her legal and financial affairs, making it unlikely that she decided to author a holographic will. *See In re Ritchie's Estate*, 389 A.2d at 88 (examining the manner in which Ritchie conducted his other affairs and concluding it would be out of character for Ritchie to have written his own will).

Based on the foregoing, we agree with the orphans' court that neither the 2010 Writing itself nor the extrinsic evidence demonstrated Decedent's testamentary intent with reasonable certainty, and we affirm the orphans' court's decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 8/27/19